**The court incorporates by reference in this paragraph and adopts as the findings and orders of this court the document set forth below. This document has been entered electronically in the record of the United States Bankruptcy Court for the Northern District of Ohio.**



Mary Ann Whipple
United States Bankruptcy Judge

**Dated: December 01 2009**

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| In Re: | ) | Case No. 09-31800 |
| | ) | |
| John P. Nye and Sheila E. Nye, | ) | Chapter 7 |
| | ) | |
| Debtors. | ) | |
| | ) | JUDGE MARY ANN WHIPPLE |

### MEMORANDUM OF OPINION AND ORDER

This case is before the court on the United States Trustee's ("the UST") motion to dismiss Debtors' Chapter 7 case for abuse under 11 U.S.C. § 707(b)(1) and (3) [Doc. # 25] and Debtors' response [Doc. # 46]. The court held a hearing on the motion that Debtors, their counsel and counsel for the UST attended in person and at which the parties presented testimony and other evidence in support of their respective positions. The district court has jurisdiction over this Chapter 7 case pursuant to 28 U.S.C. § 1334(a) as a case under Title 11. It has been referred to this court by the district court under its general order of reference. 28 U.S.C. § 157(a); General Order 84-1 of the United States District Court for the Northern District of Ohio. Proceedings to determine a motion to dismiss a case under § 707(b) are core proceedings that this court may hear and decide. 28 U.S.C. § 157(b)(1), (b)(2)(J) and (O).

Having considered the briefs and arguments of counsel and having reviewed the record in this case, for the reasons that follow, the court will grant the UST's motion and dismiss Debtors' Chapter 7 case unless they convert it to Chapter 13.

## BACKGROUND

Debtors are married and have no dependents. John Nye is a 62-year-old retired schoolteacher, having retired in 2005 after over thirty years of teaching. Sheila Nye is also a retired schoolteacher. She too retired in 2005. Debtors both had health issues at the time they retired. Debtors live in Oregon, Ohio, in relative close proximity to their daughter and her family and Sheila Nye's mother. According to Sheila Nye, this location is important since she is a caregiver for both her mother, who is confined to a wheelchair, and her grandchildren, whose mother also has ongoing health issues.

From the time of their retirement through 2007, Debtors netted over $130,000 by cashing in life insurance policies and withdrawing funds from their 403B retirement plans. They used a substantial portion of this money to make payments on their credit card debt. The funds were also used to pay medical expenses and home improvement expenses incurred in anticipation of the need to sell their home. Additional home improvements, which totaled approximately $25,0000, were paid for with their credit cards. Eventually, Debtors found it increasingly difficult to make their mortgage payments and minimum credit card payments without borrowing additional funds. Believing that they could not retain their home, they stopped making their house payments after September 2008. Debtors' son-in-law owned a house that was vacant and which he was trying to sell. Debtors agreed to, and did, begin paying him $850 per month rent for the house, and he agreed to take the house off the market. However, Debtors never moved into the house. They viewed it as a "safety net," fearing that they would be forced to move from their home.

On March 25, 2009, Debtors filed a petition for relief under Chapter 7 of the Bankruptcy Code. In their petition, they state that their debts are primarily consumer debts. Their Schedule D shows total secured debts of $274,853, which includes $236,000 secured by a first mortgage on their home and $36,100 secured by a second mortgage. According to Schedule D, Debtors value the home at $230,000. However, Sheila Nye testified that the recent Lucas County tax valuation of the property was $260,000. At the time of filing, Debtors had stopped paying rent to their son-in-law, having decided to retain their home and enter into loan modification discussions with their mortgage creditor. Debtors' Schedule D also shows a debt of $2,753 that is secured by a vacant lot in Arizona, which they value at $8,500. Although they initially stated an intention to reaffirm that debt, at the hearing on the Trustee's motion to dismiss, they voiced their decision to surrender the property.

Debtors' bankruptcy schedules also show unsecured nonpriority debts in the amount of $98,413.50, which amount includes credit card debt of $52,107, as well as $46,306 of debt associated with the lease of

2

two vehicles, a 2008 Chevrolet Trailblazer and a 2007 Mazda. Debtors have reaffirmed the Mazda lease and have stated an intention to reaffirm the Trailblazer lease. Debtors have no priority unsecured debt.

Debtors' Schedule I shows monthly income of $5,605, which consists solely of retirement income from the Ohio State Teachers Retirement System. Debtors' Schedule J shows total monthly expenses of $5,605. Their expenses include, among other things, a first mortgage expense of $1,913. Since filing their petition Debtors have entered into negotiations to modify their first mortgage loan that would reduce their monthly payment slightly to $1,828.80. [*See* Doc. # 53, Status Report & Debtors' Aff., and Doc. # 54].[1] Debtors' expenses also include a second mortgage, interest-only payment of $198, and lease payments on the Mazda of $332 and on the Trailblazer of $395. With the loan modification, Debtors' income after expenses based on their Schedules I and J totals $84. Although not included on Schedule J, Debtors have continued to make, and are current on, the $99 mortgage payment and $6.75 property tax payment for the vacant lot in Arizona.

When asked regarding Debtors' need for two cars, John Nye stated that he did not believe two cars were necessary. Sheila Nye, however, testified that, although a second car may not be necessary at this time, it will be necessary in the event her husband finds work as a substitute teacher on a part-time basis given her duties of caring for her mother and grandchildren. Other than the real estate owned by Debtors, their assets at the time of filing are modest. After filing their petition, Debtors did not begin making mortgage payments until September 2009. During the interim, they were able to save $4,000 as a "cushion" for future use.

Debtors' Form B22A calculating the means test shows that their annualized current monthly income at the time of filing this case was $79,687. The median income for a family of two, which is the size of Debtors' family, in Ohio is $52,922. However, no presumption of abuse arose under § 707(b)(2) after the calculation of allowed deductions. Instead, the UST is proceeding on his timely filed motion to dismiss for abuse solely under § 707(b)(3) based on the totality of the circumstances.

## LAW AND ANALYSIS

Where debts are primarily consumer debts, as in this case, the court may, after notice and a hearing, dismiss a Chapter 7 petition "if it finds that the granting of relief would be an abuse of the provisions of

---

[1] Although a tentative loan modification agreement under the Making Homes Affordable Act was initially reached, after further review, that agreement was rejected by their creditor. [See Doc. # 52 (Debtors' Status Report)]. An unsigned Loan Modification Agreement [Debtor's Ex. B] reflecting that tentative agreement was admitted into evidence subject to it being replaced with the executed document, which Debtors believed was, but evidently has not been, forthcoming from their creditor. [See Doc. # 53, Status Report & Debtors' Aff., and Doc. # 54]. Nevertheless, Debtors have apparently obtained an oral agreement to reduce their interest rate until September 1, 2014, and lower their monthly loan payment. [Doc. #54].

3

[Chapter 7]." 11 U.S.C. § 707(b)(1). Under § 707(b)(3), in determining whether granting relief would be an abuse, the court is required to consider "(A) whether the debtor filed the petition in bad faith; or (B) the totality of the circumstances . . . of the debtor's financial situation demonstrates abuse." 11 U.S.C. § 707(b)(3)(A) and (B). This provision was added by Congress in 2005 as a part of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"). Before BAPCPA, courts considered whether to dismiss a case for "substantial abuse" under § 707(b) based on the "totality of the circumstances." *See, e.g., In re Krohn*, 886 F.2d 123, 126 (6th Cir. 1989); *In re Price*, 353 F.3d 1135, 1139 (9th Cir. 2004). The Sixth Circuit explained that "substantial abuse" could be predicated upon either a lack of honesty or want of need, to be determined by the totality of the circumstances. *Krohn*, 886 F.2d at 126. Congress incorporated this judicially created construct in § 707(b)(3). Although pre-BAPCPA case law applying these concepts is still helpful in determining abuse under § 707(b)(3), under BAPCPA Congress has lowered the standard for dismissal in changing the test from "substantial abuse" to "abuse." *In re Mestemaker*, 359 B.R. 849, 856 (Bankr. N.D. Ohio 2007).

      In this case, the UST does not argue that Debtors filed their petition in bad faith but instead contends that the totality of the circumstances show that Debtors are not needy and that they have the ability to repay a meaningful portion of their unsecured debt. A debtor is "needy" when "his financial predicament warrants the discharge of his debts" in a Chapter 7 case. *Behlke v. Eisen (In re Behlke)*, 358 F.3d 429, 434 (6th Cir. 2004). Factors relevant to determining whether a debtor is "needy" include the ability to repay debts out of future earnings, which alone is sufficient to warrant dismissal under some circumstances. *Krohn*, 886 F.2d at 126. Other factors include "whether the debtor enjoys a stable source of future income, whether he is eligible for adjustment of his debts through Chapter 13 of the Bankruptcy Code, whether there are state remedies with the potential to ease his financial predicament, the degree of relief obtainable through private negotiations, and whether his expenses can be reduced significantly without depriving him of adequate food, clothing, shelter and other necessities." *In re Bender*, 373 B.R. 25, 30 (Bankr. E.D. Mich. 2007); *In re Burge,* 377 B.R. 573, 577 (Bankr. N.D. Ohio 2007); *see Krohn*, 886 F.2d at 126. Post-petition pre-discharge events are relevant to a § 707(b)(3) analysis. *See U.S. Trustee v. Cortez (In re Cortez)*, 457 F.3d 448, 455 (5th Cir. 2006) ("Section 707(b) does not condition dismissal on the *filing* of bankruptcy being [an abuse] but rather on the *granting of relief,* which suggests that in determining whether to dismiss under § 707(b), a court may act on the basis of any development occurring *before* the discharge is granted."); *In re Mestemaker,* 359 B.R. 849, 855-56 (Bankr. N.D. Ohio 2007).

      In arguing that Debtors have the ability to pay a meaningful portion of their unsecured debt, the UST

asserts that funds used to pay for a second vehicle and for expenses associated with the Arizona property are not necessary and can be eliminated without depriving Debtors of adequate food, clothing, shelter or other necessities. The court agrees.

Whether they now intend to surrender the Arizona lot or not, the costs associated with retaining it are simply unnecessary expenses that unsecured creditors should not be required to continue to subsidize. The average monthly mortgage and property tax expense for that property totals $105, which could be made available to pay unsecured creditors. Those expenses do not appear on Debtors' Schedule J, however, the debt is current and they have managed to maintain making the $105 in average monthly debt payments connected with the property after the filing of their instant petition. The court finds that the Arizona property could be surrendered and the amounts used to keep that property contributed to payments under a Chapter 13 plan without impacting Debtors' ability to provide themselves food, shelter, clothing and other necessities.

Notwithstanding the fact that both Debtors have retired, they also expend $728 per month as lease payments on two late model motor vehicles. There are also undoubtedly incremental costs associated with leasing a second vehicle built into Debtors' budget, such as for insurance and maintenance, although they are not quantified on the record. Based on the record before the court, a second car is a convenience to Debtors and not a necessity. The court recognizes the importance of having a reliable vehicle available in order for Sheila Nye to provide care to her mother and grandchildren. But the court does not believe such availability would be compromised by family reliance upon only one car since neither Debtor is employed. A reason proffered for continuing to pay for two vehicles was that John Nye might return to work as a substitute teacher. The court views his return to work as speculative and unlikely. He has not sought employment in more than a year and he retired from the rigors of the classroom at least in part due to health issues. Based on the court's observation of Mr. Nye at the hearing, he does not appear ready to return to those rigors. In any event, to the extent that John Nye does in fact return to work on a part-time basis as a substitute teacher, his earnings must be sufficient to pay for the second car. Otherwise, unsecured creditors would be required to continue subsidizing the convenience of leasing a second car. Elimination of the expense associated with a second vehicle is in this case the type of "belt-tightening" reasonably expected of debtors seeking bankruptcy relief. *In re Durczynski*, 405 B.R. 880, 884 (Bankr. N.D. Ohio 2009).

The Trustee also argued in his motion that Debtors' actual monthly expenses were significantly less than the budget reflected on Schedules I and J based on his understanding that Debtors were renting a home rather than incurring the mortgage expense stated on Schedule J. As addressed above, however, Debtors

5

never moved from their home into the rented house and are no longer paying rent to their son-in-law.

The Trustee also argued at the hearing that the loan modification agreement entered into between Debtors and their mortgage creditor decreased their monthly mortgage payment by approximately $90. The precise amount and status of Debtors' present monthly first mortgage payment is still unclear. [*See* Doc. ## 52- 54]. Nevertheless the court has also considered their housing expenses from a somewhat different aspect of the abuse determination, namely whether Debtors' monthly housing expenses are unreasonable and excessive for a retired couple, and ultimately unaffordable, such that some of the resources presently devoted thereto should instead be devoted to repaying their unsecured creditors. *Cf. In re Durczynski*, 405 B.R. at 885-87 (continued monthly expenses associated with retaining $250,000 home with a swimming pool an abuse under § 707(b)(3)); *In re Lubinski*, Case No. 07-31230, 2008 Bankr. LEXIS 1791, 2008 WL 2388127 (Bankr. N.D. Ohio, June 6, 2008). Debtors live in a 14 year old house that they had built and that may be worth more than a quarter of a million dollars. Notwithstanding that the house is only 14 years old, Debtors have also devoted significant resources to home improvements, some of which were financed with credit card debt that they now seek to discharge in full. Debtors could undoubtedly find safe, comfortable and much less costly housing in the Toledo area for a family of two, as evidenced by the plans that they had worked out and begun to execute to do so. The court ultimately defers on this point, however, to Sheila Nye's credible testimony about the importance of living at their present location in order to care for her mother and grandchildren.

In sum, the court is convinced that the house is at this time a need and not just a want. Given the court's other findings, the precise amount of Debtors' monthly mortgage payments is not a material fact in the court's analysis of abuse as long as the payment is not increasing, which the evidence shows, at a minimum, that it is not. The court credits as being in Debtors' favor that they have taken the steps available to them to make their home affordable as a condition of remaining there. Any reductions in their monthly housing expense are thus relevant to the extent that they will tend to make Debtors' budget workable even with just the two basic changes the court believes can reasonably be made for the benefit of their unsecured creditors without impacting their shelter, food, clothing and transportation needs.

There is no evidence that Debtors' income, which consists entirely of Ohio public entity retirement benefits, is not stable. As individuals with regular, stable income, they are eligible for Chapter 13 relief should they choose to seek such relief since their debts are less than the statutory eligibility limits. *See* 11 U.S.C. §§ 109(e), 101(30). While the $105 Arizona property expense is not reflected on Debtors' Schedule J expenses, the court does not deem that omission relevant as addressed above. Depending on which vehicle

6

Debtors would surrender, their monthly expenses as reflected on that schedule could decrease by either $332 (by surrendering the Mazda) or $395 (by surrendering the Trailblazer), making that amount available to pay unsecured creditors. Even if Debtors make no further adjustment to their budget but apply only the amounts saved by surrendering the Arizona property and one vehicle (total of $437 or $500 a month depending on which vehicle is surrendered) to fund a Chapter 13 plan over the sixty-month maximum plan duration for above-median income debtors, *see* 11 U.S.C. § 1322(d)(1), Debtors would have between approximately $23,000 and $27,000 available after payment of the Chapter 13 Trustee's administrative expenses to pay on their unsecured debt. Debtors' schedules show no unsecured priority debt and total unsecured nonpriority debt in the amount of $98,413.50, which amount includes the amounts presumably owed under both car lease agreements. While the court questions whether the amount of the total unsecured debt is overstated,[2] even assuming it is correct, under this scenario, unsecured creditors could potentially receive an approximate dividend of between 23 and 27 percent. *See In re Behlke*, 338 F.3d at 437 (finding *substantial* abuse where debtors had the ability to pay at least a 14% dividend to their unsecured creditors). The court, therefore, concludes that Debtors have the ability to repay a meaningful portion of their unsecured debt without being deprived of adequate food, clothing, shelter and other necessities, including transportation.

The availability of debtors' remedies under state law and the relief that might be afforded through private negotiations with creditors are other factors the Sixth Circuit has identified as relevant in deciding whether it would be an abuse to grant a Chapter 7 discharge in a particular case. There is some evidence that Debtors sought credit counseling that was not successful in addressing their financial issues. The record is otherwise silent regarding this factor. As the United States Trustee bears the burden of proof on the motion, *In re Wright*, 364 B.R. 640, 643 (Bankr. N. D. Ohio 2007), the court will assume that there are no such state law remedies or private negotiations that will assist in resolving Debtors' financial problems.

Nevertheless, on balance, the court finds that granting Debtors relief under Chapter 7 of the Bankruptcy Code would be an abuse of the provisions of that chapter given the following financial circumstances: (1) Debtors have stable, regular, well- above median income for a family of two; (2) they are eligible for Chapter 13 relief if they choose to seek such relief; (3) they have the ability to reduce their transportation and real property expenses without depriving themselves of any necessities; and (4) as a

---

[2] It is not clear how Debtors arrived at the amount scheduled on Schedule F as being owed on account of their car leases. The unsecured debt is not necessarily the balance owed under the lease, but rather would be the contract damages incurred by the creditor, the calculation of which would presumably include the value of the vehicle at the time it is surrendered and perhaps at the time the lease would have otherwise expired.

7

result they have the ability to repay a meaningful portion of their unsecured debt.

**THEREFORE**, for all of the foregoing reasons, good cause appearing,

**IT IS ORDERED** that Debtors are allowed thirty-five (35) days from the date of this order to file a motion to convert to a Chapter 13 case, absent which the Motion of the United States Trustee to Dismiss for Abuse Pursuant to 11 U.S.C. § 707(b)(1) and (b)(3) [Doc. #25] will be granted, and this case will be dismissed, by separate order of the court.